1

2

3

4

5

6

7

8

9

10

11

United States District Court
Northern District of California

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| **SEAN PATRICK DOYLE**,<br><br>    Plaintiff,<br><br>  v.<br><br>**CALIFORNIA DEPARTMENT OF CORRECTIONS AND REHABILITATION, ET AL.**,<br><br>    Defendants. | Case No.  12-cv-2769-YGR<br><br>**ORDER ON DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**<br><br>Re: Dkt. No. 200 |

On May 30, 2012, plaintiff Sean Patrick Doyle, a state prisoner then housed at the California Correctional Training Facility ("CTF"), filed this civil rights action under 42 U.S.C. section 1983, alleging that prison officials at CTF were deliberately indifferent to his serious medical needs.  Specifically, Mr. Doyle asserts that while he was housed at CTF in Soledad, California, defendants acted with deliberate indifference to his serious medical needs by repeatedly denying him medical treatment for his lumbar (back) and cervical (neck) pain in violation of the Eight Amendment to the United States Constitution.  Plaintiff also brings state law tort claims for negligence and negligence per se against defendants arising out of the same alleged conduct.

Before the Court is defendants' motion for summary judgment.  (Dkt. No. 200, "Mtn."). The motion is fully briefed and came for hearing on September 8, 2015.  Having carefully considered the papers submitted and being fully informed, and for the reasons set forth below, the Court hereby **GRANTS IN PART** defendants' motion for summary judgment.

I.    **BACKGROUND**

Mr. Doyle filed his second amended complaint (Dkt. No. 167, "SAC") on January 30, 2015 pursuant to the Court's order granting in part plaintiff's motion for leave to amend.  (Dkt. No. 165.)  In his SAC, Mr. Doyle alleges three claims for relief, namely: (1) violations of 42 U.S.C. section 1983; (2) negligence; and (3) negligence per se.  Mr. Doyle names four former and current employees of the California Department of Corrections and Rehabilitations ("CDCR") as defendants: Dr. Kuersten, Dr. Sepulveda, and administrators Ellis and Zamora.  In support of these claims, Mr. Doyle alleges that defendants repeatedly denied and refused to provide him with medically necessary prescriptions and surgeries.  (*See* SAC.)  Mr. Doyle seeks money damages in addition to injunctive relief ordering defendants to provide Mr. Doyle with his requested back surgery, epidural steroid injections, and "necessary medications."  (*See id*.)

**A.  Plaintiff's History of Lumbar (Back) and Cervical (Neck) Pain**

Mr. Doyle has experienced back pain since at least 2005 when neurosurgeon Dr. Harold D. Segal, M.D. began treating him on referral from CTF.  (Dkt. No. 202-3, "Segal Decl.," ¶ 2.) Between June 2005 and July 2009, Dr. Segal administered epidural steroid injections[1] to Mr. Doyle nine times.[2]  In addition, several MRI's of Mr. Doyle's lumbar and cervical spine were ordered and taken throughout this time.  (*See* Dkt. No. 202-3 through 202-7, Exh. 1 to Segal Decl.)

On May 7, 2010, Dr. Shahram Ehteshami, M.D. conducted a neurosurgery consultation with Mr. Doyle through the telemedicine system.  (Dkt. Nos. 200-6, Exh. A to "Barnett Decl.," part 1 at 77-79.)  Following that consultation, Dr. Ehteshami noted that Mr. Doyle "may need neck

---

[1] The Court notes that the SAC also includes an allegation that Mr. Doyle was not properly returned to Dr. Segal for an epidural steroid injection in July 2006. (SAC ¶ 20.)  However, Mr. Doyle does not provide any nexus between this allegation and the named defendants, and so no further analysis is necessary.  Likewise, Mr. Doyle has failed to provide evidence of a nexus between events alleged in the SAC pre-dating November 2010 and the named defendants.  The Court similarly declines to address the likelihood that Mr. Doyle could prevail on these allegations.

[2] Dr. Segal's records show that the procedures occurred on the following dates: June 10, 2005; July 22, 2005; December 23, 2005; July 14, 2006; November 17, 2006; March 23, 2007; October 12, 2007; September 26, 2008; and July 28, 2009. (*See* Dkt. No. 202-3 through 202-7, Exh. 1 to Segal Decl.)

2

surgery at C3-4 considering the findings of the 2008 MRI," and recommended a new MRI of the

cervical spine.  (*Id*.)  Dr. Ehteshami then learned of a February 9, 2010 MRI of Mr. Doyle's

cervical spine, and upon review thereof, conducted a follow-up neurosurgical consultation with

Mr. Doyle via the telemedicine system on November 12, 2010.  (*Id*. at 80-83.)  In her preliminary

report on the November 12, 2010 consultation, Dr. Ehteshami stated in pertinent part:

> RECCOMENDATIONS: In great detail, the findings, including the
> symptoms and the objective findings and their correspondents as
> well as the treatment options, including conservative versus surgical
> treatment options and the risks and benefits were all discussed in
> great detail.  Regarding the proposed surgery of C3-4
> decompression, discectomy, fusion, and possible instrumentation
> and possible corptectomy, the technique used, the reasons for it, the
> complications related to such surgeries, including damage to the
> spinal cord and nerve roots, paralysis, loss of sensation, loss of
> bowel or bladder control and sexual function, hemorrhages which
> may need blood transfusion, different infections, damage to other
> systems and organs, failure of the surgery, were all discussed.  He
> was strongly advised that no guarantee can be given as for the effect
> of the surgery on the pain and his postoperative physical and
> functional abilities.  He was also advised that some of the symptoms
> and the findings may not be related to the focal C3-4 disk herniation,
> and obviously those are not going to be addressed through the
> proposed surgery.  All of the patient's questions were answered, and
> he was strongly advised to think about his options and to let you
> know about his decision.

(*Id*. at 83.)

Four days later, on November 16, 2010, Mr. Doyle had his first consultation with Dr.

Kuersten.  (Dkt. No. 200-2, "Kuersten Decl.," ¶ 4.)  Defendant Dr. Kuersten, who began working

at CTF in October 2010, was assigned to serve as Mr. Doyle's primary care physician at that time.

(*Id*. ¶ 3.)  During their first consultation, Dr. Kuersten provided Mr. Doyle with requested refills

for his pain medication.  (*Id.* ¶ 6.)  At Mr. Doyle's request, Dr. Kuersten also completed requests

for service ("RFS") to CTF medical management on behalf of Mr. Doyle, requesting to see Dr.

Segal for epidural steroid injections and a second opinion regarding cervical surgery.  (*Id*.)  On

November 30, 2010, CTF medical management granted the RFS to see Dr. Segal regarding

epidural steroid injections, but, upon administrative review, "Dr. Lam" denied the RFS as to the

United States District Court
Northern District of California

United States District Court
Northern District of California

1    cervical surgery opinion.  (*Id*. ¶ 7.)  When Dr. Kuersten met with Mr. Doyle again on December 6,

2    2010, he prescribed pain medication and also provided Mr. Doyle with a physical limitations

3    chrono[3] that he could present to prison staff to obtain reasonable accommodations.  (*Id*. ¶ 8.)

4          Pursuant to the RFS submitted by Dr. Kuersten and approved by CTF medical

5    management, Mr. Doyle was seen by Dr. Segal on January 4, 2011.  In a letter documenting that

6    visit, Dr. Segal recommended the following plan for Mr. Doyle:

> Recommend this gentleman have a CAT scan of the cervical spine to
> further delineate the bony pathology.  Lesions at the C3-4 level tend
> to be asymptomatic in my judgment; however, this certainly may be
> a problem for him and should be better delineated by a view of his
> bony pathology as best seen on a CAT scan.  In addition, I would
> recommend lower epidural steroid injections and will proceed with
> one injection in the near future.  I will see him again in six weeks.

12   ("January 2011 Plan") (Segal Decl., Exh. 1 at 1.)  The January 4, 2011 appointment was Mr.

13   Doyle's final visit with Dr. Segal.  According to Dr. Segal, had he continued to treat Mr. Doyle, he

14   "would have recommended a lumbar fusion because of the severity of his back pain."  (Segal

15   Decl. ¶ 5.)

16         On January 6, 2011, Dr. Kuersten met with Mr. Doyle for a follow-up consultation

17   regarding his cervical and lumbar spinal pain.  (Kuersten Decl. ¶ 11.)  In his notes from that visit,

18   Dr. Kuersten noted that, with respect to Mr. Doyle's cervical spine, the RFS for a second opinion

19   was previously denied.  (Dkt. No. 200-7, Exh. A to Barnett Decl., part 2 at 2.)  With respect to Mr.

20   Doyle's lumbar spine, Dr. Kuersten was awaiting the report from Dr. Segal (ostensibly from Mr.

21   Doyle's January 4, 2011 visit) to determine Mr. Doyle's need for further treatment.  (*Id*.)  Dr.

22   Kuersten recommended Mr. Doyle's next visit be in 60 days, or approximately March 6, 2011.

23   (*Id*.)

24         On March 22, 2011, Dr. Kuersten met with Mr. Doyle for his 60-day follow up.  (*Id*. at 8.)

25

26    [3] The new physical limitations chrono included: no prolonged standing; no prolonged
sitting; no bending, stooping, or twisting; no lifting over 20 pounds; no use of left arm; and no
27   working at heights.  (Exh. A to Barnett Decl., part 1 at 87.)  Additionally, a comprehensive
accommodations chrono was already in place providing Mr. Doyle with a ground floor cell, a
28   bottom bunk, a wood cane, an extra mattress, and a cervical pillow.  (Exh. A to Kuersten Decl.)

1    During that visit, Dr. Kuersten noted that Mr. Doyle met with Dr. Segal on January 4, 2011 and

2    that an RFS for a cervical CAT scan recommended by Dr. Segal had been denied.  (*Id.*)  Dr.

3    Kuersten discussed other treatment options with Mr. Doyle with respect to the cervical spine, and

4    submitted an RFS for a nerve conduction study ("NCS").  (*Id.*)  Again, Dr. Kuersten set a goal for

5    Mr. Doyle to return for a follow up visit in 60 days.

6         Dr. Kuersten also referred Mr. Doyle to Dr. Darrin Bright, D.O. for an Americans with

7    Disabilities Act consultation that occurred on March 31, 2011.  (Kuersten Decl. ¶ 11.)  In his

8    report, Dr. Bright noted that Mr. Doyle has had chronic low back pain since 2005, and that he

9    began having severe neck pain as well beginning in around 2008.  (Exh. A to Barnett Decl., part 2

10   at 18-20.)  After a physical examination of Mr. Doyle and review of Mr. Doyle's imaging studies,

11   Dr. Bright came to the conclusion that Mr. Doyle had nothing in his low back, legs, or neck that

12   would require Mr. Doyle to have any physical limitations for a job assignment.  (*Id.*)

13        On June 2, 2011, Dr. Kuersten again met with Mr. Doyle for a 60-day follow up

14   appointment.  During that visit, Dr. Kuersten updated Mr. Doyle's chrono with continuation of

15   physical accommodations and work limitations.  (Exh. A to Barnett Decl., part 2 at 10.)  Dr.

16   Kuersten also noted that he submitted an RFS for an NCS, but he recalled the RFS was denied.[4]

17   (*Id.*)  Dr. Kuersten scheduled a follow up visit for 90 days, but he had no further interaction with

18   Mr. Doyle due to his transfer from CTF to work in another facility in August 2011.  (Kuersten

19   Decl. ¶ 2.)

20        Following Dr. Kuersten's departure, Mr. Doyle received additional updated chrono's with

21   physical accommodations and work limitations between August and December 2011.  (Exh. A to

22   Barnett Decl., part 2 at 23-31.)  In December 2011, Mr. Doyle was transferred to another facility.

23   (*Id.* at 31.)

24        Mr. Doyle testifies that he continues to experience pain in his lumbar and cervical spine.

25   His "symptoms include excruciating neck and back pain, lower back spasms, left flank pain,

26

27        [4] The record shows that an NCS was performed on August 10, 2011.  (Exh. A. to Barnett
28   Decl., part 2 at 11-17.)

United States District Court
Northern District of California

1   impaired mobility, numbness in my extremities, and the inability to lift heavy objects."  (Dkt. No.

2   202-2, "Plaintiff Decl.," ¶ 4.)  Further, Dr. Segal submitted a declaration indicating that he

3   believed the "severity of [Mr. Doyle's] back pain" could have warranted a lumbar fusion to

4   alleviate his lower back pain.  (Segal Decl. ¶ 5.)  Conversely, defendants' expert Dr. Barnett relies

5   on progress notes from Mr. Doyle's current institution, dated November 6, 2014 and May 10,

6   2015, to opine that Mr. Doyle "is doing well in a new prison location, where he continues to

7   receive the type of conservative treatment provided by Defendants." (Exh. I to Barnett Decl.;

8   Barnett Decl. ¶ 19.)

9                    **B.  Plaintiff's Relevant 602 Inmate Appeal**

10          Mr. Doyle filed an inmate health grievance dated December 6, 2010, tracking log no. CTF

11   HC 11005581, institution log no. CTF 14-10-14131 ("602 Appeal").  In his 602 Appeal, Mr.

12   Doyle presented four requests: (i) transfer to a PCP other than Dr. Kuersten; (ii) reassignment to a

13   porter position for his work assignment, as well as a "lay-in" order; (iii) treatment for lower back

14   pain by Dr. Segal, epidural steroid injections, and for Dr. Segal to review his February 2010

15   cervical MRI for a second opinion on surgery; and (iv) immediate enrollment in physical therapy.

16   (Dkt. No. 84-2, "Nguyen Decl.," Exh. 1 at 48-49.)

17          On January 6, 2011, a first level review of the 602 Appeal purported to grant Mr. Doyle's

18   requests in part.  (Nguyen Decl., Exh. 1 at 50.)  Particularly, the response reiterated the treatment

19   for lower back pain already approved and provided.  (*Id*.)  The first level review, signed by

20   Registered Nurse Valiente, also partially granted Mr. Doyle's request for physical therapy pending

21   Mr. Doyle's submission of the necessary health care services request form.  (*Id*.)  Otherwise, the

22   first level review denied Mr. Doyle's 602 Appeal requests.  (*Id*.)

23          The second level response to Mr. Doyle's 602 Appeal dated February 18, 2011 was signed

24   by defendant G. Ellis ("Ellis"), Chief Executive Officer of CTF, and defendant Dr. M. Sepulveda,

25   M.D., Chief Medical Executive at CTF.  (*Id*. at 51-52.)  In that response, defendants Ellis and Dr.

26   Sepulveda denied the 602 Appeal, stating: "[t]here is no medical indication at the time for you be

27   reassigned to a new provider or be enrolled in physical therapy."  (*Id*. at 51.)  As to Mr. Doyle's

28   request to receive a new work assignment, defendants reiterated in the second level response that

United States District Court
Northern District of California

6

United States District Court
Northern District of California

1    "work assignments are a custody issue and can not [sic] be dictated by medical staff." (*Id*.) In

2    sum, defendants Ellis and Dr. Sepulveda denied Mr. Doyle's second level review in whole. (*Id*.)

3    Mr. Doyle then submitted a request for third level review, known as director's level of

4    review ("DLR"), dated March 4, 2011.[5] In that request, Mr. Doyle reiterated his dissatisfaction

5    with the first and second levels of review, and underscored the severe pain he continued to

6    experience in connection with his neck and back issues. (*Id*. at 46.) Mr. Doyle further stated that

7    "[d]eliberate delays for specialist treatment [left him] in significant and sever [sic] pain, totally

8    disabling [him] at times and keeping [him] from reasonable independent function; including

9    bladder and bowel control on occasion." (*Id*.)

10    During the relevant time period, defendant L. Zamora ("Zamora") served as Chief of the

11    Inmate Correspondence and Appeals Branch ("ICAB"), the unit responsible for handling inmates'

12    DLR requests. (Dkt. No. 200-15, "Zamora Decl.," ¶¶ 1-2.) When ICAB receives a DLR request,

13    "medically trained and licensed clinicians review the submitted information along with the

14    appealing inmate's health care records." (*Id*. ¶ 6.) Once the DLR response is drafted by a

15    clinician, Zamora or her designee at ICAB "would review it…and analyze the supplemental

16    information that the clinician used to develop the appeals response." (*Id*. ¶¶ 6-7.) Zamora's

17    review – or her designee's – is "limited to ensure that administrative rules and procedures [are]

18    satisfied in connection with the handling of an inmate's health care grievance." (*Id* ¶ 9.)

19    With respect to Mr. Doyle's DLR request at issue, Zamora's designee signed the DLR

20    decision letter denying Mr. Doyle's health care grievance at this third level of review. (*Id*. ¶ 7, *id*.

21    at Exh. A.) The DLR decision letter stated in pertinent part:

22    
23    
At the DLR…it was determined your care related to your appeal
issues was adequate, as you received medical treatment, medication
was provided and your concerns were appropriately addressed at the
[first and second levels of review]…After review, there is no
compelling evidence that warrants intervention at the [DLR] as your
medical condition has been evaluated by licensed clinical staff and
you are receiving treatment deemed medically necessary…No

24    
25    
26    

27    _____
[5] The DLR decision mistakenly states that plaintiff's request for DLR was submitted on
February 25, 2011.

28    

7

United States District Court
Northern District of California

1

2

          changes or modifications are required by the decision.

(*Id*. at Exh. A.)  The DLR decision exhausted Mr. Doyle's administrative remedies, and Mr. Doyle

3

timely instituted this action.

4

     **II.**     **STANDARD OF REVIEW**

5

          Summary judgment is proper where the pleadings, discovery and affidavits demonstrate

6

that there is "no genuine issue as to any material fact and that the moving party is entitled to

7

judgment as a matter of law."  Fed. R. Civ. P. 56(c).  Material facts are those which may affect the

8

outcome of the case.  *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 248 (1986).  A dispute as to a

9

material fact is genuine if there is sufficient evidence for a reasonable jury to return a verdict for

10

the nonmoving party.  *Id.*

11

          The party moving for summary judgment bears the initial burden of identifying those

12

portions of the pleadings, discovery, and affidavits which demonstrate the absence of a genuine

13

issue of material fact.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  Where the moving

14

party will have the burden of proof on an issue at trial, it must affirmatively demonstrate that no

15

reasonable trier of fact could find other than for the moving party.  On an issue for which the

16

opposing party by contrast will have the burden of proof at trial, as is the case here, the moving

17

party need only point out "that there is an absence of evidence to support the nonmoving party's

18

case."  *Id*. at 325.

19

          Once the moving party meets its initial burden, the nonmoving party must go beyond the

20

pleadings and, by its own affidavits or discovery, "set forth specific facts showing that there is a

21

genuine issue for trial."  Fed. R. Civ. P. 56(e).  The court is only concerned with disputes over

22

material facts and "factual disputes that are irrelevant or unnecessary will not be counted."

23

*Anderson*, 477 U.S. at 248.  It is not the task of the court to scour the record in search of a genuine

24

issue of triable fact.  *Keenan v. Allan*, 91 F.3d 1275, 1279 (9th Cir. 1996).  The nonmoving party

25

has the burden of identifying, with reasonable particularity, the evidence that precludes summary

26

judgment.  *Id*.  If the nonmoving party fails to make this showing, "the moving party is entitled to

27

a judgment as a matter of law."  *Celotex*, 477 U.S. at 323.

28

1    **III.    DISCUSSION**

2        **A.  Deliberate Indifference Under the Eighth Amendment**

3        The Eighth Amendment protects prisoners from inhumane conditions of confinement.

4    *Farmer v. Brennan*, 511 U.S. 825, 832 (1994)).  To prevail on an Eighth Amendment claim for

5    deliberate indifference arising out of inadequate medical care, a plaintiff must show "deliberate

6    indifference" to his "serious medical needs."  *Estelle v. Gamble*, 429 U.S. 97, 104 (1976).  "This

7    includes 'both an objective standard—that the deprivation was serious enough to constitute cruel

8    and unusual punishment—and a subjective standard—deliberate indifference.'"  *Colwell v.*

9    *Bannister,* 763 F.3d 1060, 1066 (9th Cir. 2014) (citation omitted).  Here, defendants concede that

10   Mr. Doyle's pain constitutes a serious medical need.  (Mtn. at 16:16.)  Thus, only the subjective

11   element of deliberate indifference is at issue.

12       To satisfy the subjective element of deliberate indifference, the plaintiff must show that

13   "the official knows of and disregards an excessive risk to inmate health or safety; the official must

14   both be aware of facts from which the inference could be drawn that a substantial risk of serious

15   harm exists, and he must also draw the inference."  *Farmer*, 511 U.S. at 837.  A plaintiff must

16   establish that the course of treatment the doctors chose was "medically unacceptable under the

17   circumstances" and that they embarked on this course in "conscious disregard of an excessive risk

18   to Plaintiff's health."  *Toguchi v. Chung*, 391 F.3d 1051, 1058-60 (9th Cir. 2004) (internal

19   citations and quotations omitted).  Indifference may appear "when prison officials deny, delay or

20   intentionally interfere with medical treatment, or it may be shown by the way in which prison

21   physicians provide medical care."  *Hutchinson v. United States*, 838 F.2d 390, 392 (9th Cir. 1988)

22   (citing *Estelle*, 429 U.S. at 106).  A claim of mere negligence related to medical problems, or a

23   difference of opinion between a prisoner patient and a medical doctor, is not enough to make out a

24   violation of the Eighth Amendment.  *Franklin v. Oregon*, 662 F.2d 1337, 1344 (9th Cir. 1981).

25   Where doctors have chosen one course of action and a prisoner-plaintiff contends that they should

26   have chosen another course of action, the plaintiff "must show that the course of treatment the

27   doctors chose was medically unacceptable under the circumstances... and the plaintiff must show

28

United States District Court
Northern District of California

9

1    that they chose this course in conscious disregard of an excessive risk to plaintiff's health."

2    *Jackson v. McIntosh,* 90 F.3d 330, 332 (9th Cir.1996) (internal citations omitted).

3    　　　For the reasons discussed below, Mr. Doyle has failed to show any triable issue of material

4    fact on his claims of deliberate indifference under the Eighth Amendment against defendants, with

5    the exception of Dr. Kuersten on the single issue of whether he was indifferent to Dr. Segal's

6    January 2011 Plan for epidural steroid injections to the lumbar spine.

7    **1.    Defendant Kuersten**

8    　　　Dr. Kuersten acted as Mr. Doyle's primary care physician and treated him while Mr. Doyle

9    was housed at CTF-Soledad between November 2010 and August 2011.  Mr. Doyle contends that,

10   during this period, Dr. Kuersten "repeatedly den[ied]" surgical treatment.  (Dkt. No. 202, "Oppo.,"

11   at 6:23-27.)  It is undisputed that Mr. Doyle's cervical and lumbar pain constituted a serious

12   medical need of which Dr. Kuersten was aware.[6]  (*See* Mtn. at 16:16; Kuersten Decl. ¶ 4.)  Dr.

13   Kuersten contends that he is entitled to judgment as a matter of law on Mr. Doyle's claims

14   because the evidence establishes he was not subjectively indifferent to Mr. Doyle's spinal pain by

15   purposefully failing to respond thereto.  The Court agrees that Dr. Kuersten has shown that he was

16   not deliberately indifferent, on the one hand, to Mr. Doyle's requests for cervical and lumbar

17   surgeries.  On the other, the Court finds that a material fact is in dispute as to whether Dr.

18   Kuersten was deliberately indifferent in failing to ensure that Mr. Doyle received epidural steroid

19   injections to the lumbar spine after reviewing Dr. Segal's January 2011 Plan.

20   **a.    Cervical Spine Condition**

21   　　　The evidence shows that, during the approximately ten months in which Dr. Kuersten

22   acted as Mr. Doyle's primary care physician, he did not act with deliberate indifference to Mr.

23   Doyle's cervical spine pain.  Despite Mr. Doyle's assertions that Dr. Kuersten was aware of the

24   recommendation for [cervical] surgery…" but that he "unnecessarily delayed the [cervical]

25   

26   　　　　[6] Mr. Doyle inexplicably argues in his opposition that there is a dispute of fact as to
whether Mr. Doyle's conditions presented a serious risk of harm, and whether defendants were

27   aware of Mr. Doyle's serious medical needs.  (Oppo. at 5:16-19.)  The record is clear, however,
that Mr. Doyle's pain constituted a serious medical need of which defendants were aware, and

28   defendants concede that point.  (Mtn. at 16:16, 16:26.)

United States District Court
Northern District of California

United States District Court
Northern District of California

1    surgery and did absolutely nothing to facilitate his treatment," (Oppo. at 6:16-18.), the record

2    shows otherwise.  Dr. Kuersten met with Mr. Doyle for their first consultation just four days after

3    Dr. Ehteshami discussed the potential benefits *and concerns* of cervical surgery with Mr. Doyle.

4    During that initial visit on November 16, 2010, Dr. Kuersten provided Mr. Doyle – at Mr. Doyle's

5    request – with refills for his pain medication, an RFS to see Dr. Segal for epidural steroid

6    injections for his lumbar pain, and an RFS to see Dr. Segal for a second opinion on the cervical

7    surgery discussed with Dr. Ehteshami.  Mr. Doyle then saw Dr. Segal on January 4, 2011, to

8    address his lumbar condition.  A Dr. Lam, however, denied the RFS for Dr. Segal to provide a

9    second opinion on the cervical surgery on November 30, 2010.

10        Following their initial November 16, 2010 consultation, Dr. Kuersten continued to treat

11   Mr. Doyle for his lumbar and cervical spinal pain throughout the ensuing months.  On December

12   6, 2010, Dr. Kuersten prescribed further pain medication for Mr. Doyle, and provided a physical

13   limitations chrono to present to prison staff for reasonable accommodations.  Dr. Kuersten also

14   met with Mr. Doyle on January 6, 2011, March 22, 2011, and June 2, 2011, and provided Mr.

15   Doyle the following care for his spinal pain: referral to Dr. Bright for an Americans with

16   Disabilities Act consultation; submission of an RFS for NCS; and provision of an update chrono

17   for continuation of physical accommodations and work limitations.  After Dr. Kuersten transferred

18   from CTF-Soledad, notes from a consultation with a different primary care physician on

19   November 10, 2011 reflect that Mr. Doyle "declines [cervical] surgery" and has been "stable since

20   2010."  (Exh. A to Barnett Decl., part 2 at 26.)

21        Mr. Doyle has not introduced evidence that Dr. Kuersten's treatment of his cervical spine

22   condition was medically unacceptable in light of the circumstances.  *Jackson,* 90 F.3d at 332.

23   Likewise, the evidence could not support a conclusion that Dr. Kuersten intentionally delayed or

24   denied medical care for Mr. Doyle's cervical spine pain.  *Id.*  It is undisputed that Dr. Kuersten

25   submitted an RFS for a second opinion on the cervical surgery during his first consultation with

26   Mr. Doyle.  Additionally, Dr. Segal informed Dr. Kuersten by letter in January 2011 that, in his

27   professional opinion as a neurosurgeon, Mr. Doyle's lesions at the C3-4 level tended to be

28   asymptomatic.  Based on that information, Dr. Kuersten continued to treat Mr. Doyle for his

1    cervical pain for several months, employing his medical training and judgment to provide

2    appropriate medical care.  Mr. Doyle has not introduced any evidence otherwise to raise a genuine

3    issue of material fact.

### b.   Lumbar Spine Condition

5    With respect to his lumbar pain, Mr. Doyle asserts that Dr. Kuersten intentionally denied

6    and delayed his access to back surgery, and also denied his access to epidural steroid injections to

7    the lower spine.  In support of the first point, Mr. Doyle offers Dr. Segal's declaration for the

8    proposition that "Dr. Segal was considering surgery for Mr. Doyle, and would have prescribed

9    surgery for his back had he continued to treat him."  (Oppo. at 5:11-12.)  Notably absent from Dr.

10   Segal's declaration, and Mr. Doyle's opposition, is any assertion that Dr. Kuersten could have

11   been aware of Dr. Segal's consideration of a lumbar fusion for Mr. Doyle during the relevant time

12   (when Dr. Kuersten acted as Mr. Doyle's primary care physician).  There is also no evidence that

13   Dr. Kuersten intentionally denied Mr. Doyle the opportunity to receive this care from Dr. Segal.

14   In connection with the epidural steroid injections, it is undisputed that on January 4, 2011,

15   Dr. Segal recommended further injections for Mr. Doyle.  It is similarly undisputed that Mr. Doyle

16   was not seen or treated by Dr. Segal at any time after that recommendation.  The evidence also

17   shows that that Dr. Kuersten – as Mr. Doyle's primary care physician – did not take any steps to

18   facilitate Mr. Doyle's return to Dr. Segal to receive the epidural steroid injections.  Dr. Kuersten

19   has not provided any explanation for this failure, nor has he argued that he made a valid

20   professional judgment based on his medical training not to allow Mr. Doyle to return to Dr. Segal.

21   Accordingly, a dispute remains as to whether Dr. Kuersten denied, delayed, or intentionally

22   interfered with medical treatment recommended by Dr. Segal.  *Hutchinson*, 838 F.2d at 392.  In

23   other words, whether his failure amounts to deliberate indifference under the Eighth Amendment

24   is an open issue of fact suitable for trial.  Summary judgment on this ground is denied.

25   With respect to Mr. Doyle's other medical claims, at most, he has shown a difference of

26   opinion between himself and his treating physician on whether surgeries were necessary.  This

27   alone cannot form the basis of a claim for deliberate indifference under the Eighth Amendment.

28   *Toguchi*, 391 F.3d at 1058-60.  Accordingly, no reasonable juror could find that Dr. Kuersten's

United States District Court
Northern District of California

1     actions were wanton to Mr. Doyle's serious medical needs with respect to cervical or lumbar

2     surgery, and Dr. Kuersten is entitled to judgment as a matter of law on this claim on those bases.

3     *See Estelle*, 429 U.S. at 104.

4                                    **2.   Defendant Sepulveda**

5           Mr. Doyle alleges that defendant Dr. Sepulveda was deliberately indifferent to his serious

6     medical needs when he handled the 602 Appeal at the second level of review.  The record shows

7     that Dr. Sepulveda was the Chief Medical Executive at CTF during the relevant time.  (Dkt. No.

8     85, "Sepulveda Decl.," ¶ 4.)  Although Dr. Sepulveda is a physician, he did not act as Mr. Doyle's

9     primary care physician and did not otherwise provide medical care to Mr. Doyle.  (*Id*. ¶¶ 7-8.)

10    Instead, Dr. Sepulveda used his medical training and judgment to review, and in the end deny, Mr.

11    Doyle's 602 Appeal at the second level of review.  (*Id*. ¶ 14.)  In Dr. Sepulveda's opinion, Mr.

12    Doyle's "requests regarding his medical care were unwarranted or had been satisfactorily

13    addressed through treatment."  (*Id*. ¶ 15.)

14          It appears, although it is not entirely clear, that Mr. Doyle seeks to hold Dr. Sepulveda

15    liable under the Eighth Amendment for the manner in which Mr. Doyle's medical grievance was

16    reviewed.  Mr. Doyle has not presented any evidence that Dr. Sepulveda's decision was medically

17    unacceptable under the circumstances or that Dr. Sepulveda denied the 602 Appeal in conscious

18    disregard of an excessive risk to Mr. Doyle's health.  *Jackson*, 90 F.3d at 332.  Mr. Doyle

19    obviously disagrees with Dr. Sepulveda's decision, but without more, he cannot survive a motion

20    for summary judgment.  *Toguchi*, 391 F.3d at 1058-60 (disagreement over the appropriate course

21    of treatment cannot support an Eighth Amendment violation).

22          The testimony of Dr. Segal, the only evidence Mr. Doyle cites outside of the medical

23    record and his own declaration, does not alter the analysis.  Importantly, Dr. Segal does not

24    demonstrate that Dr. Sepulveda's decision on the 602 Appeal was medically unacceptable.

25    Rather, Dr. Segal says that he previously noted Dr. Ehteshami recommended cervical surgery at

26    the C3-C4 level.  (Segal Decl. ¶ 4.)  Dr. Segal's declaration does not, however, support a

27    conclusion that the cervical surgery was medically necessary.  To the contrary, Dr. Segal's

28    January 4, 2011 letter stated that Mr. Doyle's lesions at C3-C4 were "asymptomatic" in his

*United States District Court*
*Northern District of California*

13

1    opinion. (*Id.*, Exh. 1 at 1.)  In addition, Dr. Segal now says that he would have recommended a

2    lumbar fusion had he continued to treat Mr. Doyle.  (*Id.* ¶ 5.)  This treatment, however, was not at

3    issue in the 602 Appeal.  Dr. Sepulveda never denied a lumbar fusion, nor is there any evidence

4    that he prevented Mr. Doyle from receiving that treatment.

5    　　　　Based on the above, the Court finds that Mr. Doyle has failed to raise a triable issue with

6    respect to whether Dr. Sepulveda acted with deliberate indifference to his serious medical needs.

7    At most, Mr. Doyle could only demonstrate a difference of opinion between himself as the patient

8    and Dr. Sepulveda's medical judgment, or a difference of medical opinion between doctors,

9    neither of which is sufficient, as a matter of law, to establish deliberate indifference.  *Toguchi*, 391

10   F.3d at 1058-60.  Accordingly, Dr. Sepulveda is entitled to judgment as a matter of law on Mr.

11   Doyle's Eighth Amendment claim.

### 3.  Defendants Ellis and Zamora

13   　　　　Mr. Doyle alleges that defendants Ellis and Zamora were deliberately indifferent to his

14   serious medical needs when they handled the 602 Appeal.  The record shows that defendants Ellis

15   and Zamora are the CEO at CTF and the Chief of Inmate Correspondence at ICAB, respectively.

16   (Dkt. No. 200-1, "Ellis Decl.," ¶ 2; Zamora Decl. ¶ 1.)  Therefore, defendants Ellis and Zamora

17   only had administrative responsibilities concerning Mr. Doyle's 602 Appeal to ensure that the

18   deadlines were met and that issues raised by Mr. Doyle had been addressed by the response.  (Ellis

19   Decl. ¶ 9; Zamora Decl. ¶ 9.)  Defendant Ellis relied on and deferred to Dr. Sepulveda's medical

20   judgments regarding Mr. Doyle's 602 Appeal.  (Ellis Decl. ¶9.)  Similarly, Zamora – or her

21   designee – relied on the opinions of the medically trained and licensed clinicians responsible for

22   drafting the DLR appeal response.  (Zamora Decl. ¶¶ 6-7.)

23   　　　　Because defendants Ellis and Zamora relied on the expertise of a physician and medically

24   trained clinicians, and served in an administrative capacity, there is no evidence in the record

25   sufficient for a reasonable jury to find their denial of the 602 Appeal amounted to deliberate

26   indifference of Mr. Doyle's serious medical needs.  It simply cannot be said that, by signing off on

27   the denials at the second and third levels, defendants Ellis or Zamora disregarded a substantial risk

28   of harm to Mr. Doyle's health by failing to take reasonable steps to abate it.  *See Peralta v.*

United States District Court
Northern District of California

United States District Court
Northern District of California

1    *Dillard*, 744 F.3d 1076, 1086-87 (9th Cir. 2014) (en banc) (finding no reasonable jury could find

2    deliberate indifference where a prison official with no medical expertise in the relevant field,

3    acting in an administrative capacity, denied an inmate appeal for medical care after it was

4    reviewed by qualified medical experts); *see also Mann v. Adams*, 855 F.2d 639, 640 (9th Cir.

5    1988) (finding no constitutional right of prisoners to the proper functioning of a prison

6    administrative appeal system).  Accordingly, there is no triable issue of fact as to Mr. Doyle's

7    deliberate indifference claims against Ellis and Zamora.  These defendants are entitled to judgment

8    as a matter of law.  *See Celotex*, 477 U.S. at 323.

9                    **B.   State Tort Law Claims for Negligence and Negligence Per Se**

10                Mr. Doyle also asserts that defendants are liable for the same actions under theories of

11   negligence and negligence per se in violation of California Government Code section 845.6.

12   (SAC ¶¶ 35-40.)   Defendants move for summary judgment on these state tort law claims, arguing

13   they are meritless, but without citing to any authority in support thereof.  As to Dr. Kuersten,

14   defendants contend that he provided "ample medical care" to Mr. Doyle.  (Mtn. at 20:17-20.)

15   With respect to Dr. Sepulveda and administrators Ellis and Zamora, defendants claim they could

16   not have been negligent because their roles were limited to reviewing the 602 Appeal.  (Mtn. at

17   20:20-26.)

18                Defendants, as the moving party, had the initial burden to show an absence of evidence to

19   support Mr. Doyle's claims for negligence and negligence per se.  *See Celotex*, 477 U.S. at 323.

20   Defendants have utterly failed to do so.  In fact, defendants do not address the elements of either

21   claim.  Instead, defendants list the treatment defendants *did provide* Mr. Doyle, and then

22   circuitously conclude that there is no evidence that defendants' decision *not to provide* additional

23   treatment caused any injury to Mr. Doyle.  In response to Mr. Doyle's declaration that he

24   continues to suffer from back and neck pain, defendants reply that Mr. Doyle's pain was not

25   caused by defendants' negligence.  Defendants' wholly unsupported arguments are insufficient to

26   satisfy their burden on summary judgment to show an absence of evidence to support Mr. Doyle's

27   claims under theories of negligence or negligence per se.  *Id*.  Defendants' motion on this ground

28   is denied.

United States District Court
Northern District of California

1

### C.  Qualified Immunity

2          Defendants additionally move for summary judgment on the ground that, as government

3    officials, they are entitled to qualified immunity on Mr. Doyle's claims.  "The doctrine of qualified

4    immunity protects government officials 'from liability for civil damages insofar as their conduct

5    does not violate clearly established statutory or constitutional rights of which a reasonable person

6    would have known.'"  *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (quoting *Harlow v.*

7    *Fitzgerald*, 457 U.S. 800, 818 (1982)).  Qualified immunity protects "all but the plainly

8    incompetent or those who knowingly violate the law," *Hunter v. Bryant*, 502 U.S. 224, 229 (1991)

9    (quoting *Malley v. Briggs*, 475 U.S. 335, 341 (1986)), and "spare[s] a defendant not only

10   unwarranted liability, but unwarranted demands customarily imposed upon those defending a long

11   drawn out lawsuit."  *Siegert v. Gilley*, 500 U.S. 226, 232 (1991).  "[Q]ualified immunity is 'an

12   immunity from suit rather than a mere defense to liability.'"  *Pearson*, 555 U.S. at 231 (quoting

13   *Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985)).

14          Courts assess two factors in determining whether officials are owed qualified immunity:

15   (1) whether the officer's conduct violated a constitutional right; and (2) if so, whether the right

16   was clearly established in light of the specific context of the case.  *Id*. at 232, 236.  For the reasons

17   set forth above, the Court largely finds that defendants did not act with deliberate indifference in

18   violation of the Eighth Amendment.  Accordingly, that same conduct by defendants did not violate

19   Mr. Doyle's constitutional rights, and defendants are entitled to judgment as a matter of law on

20   qualified immunity grounds as to the Eighth Amendment as well as the state tort law claims for

21   negligence and negligence per se.  *Rodriguez v. Maricopa Cty. Comm'y College Dist.*, 605 F.3d

22   703, 711 (9th Cir. 2010) (defendant entitled to qualified immunity where plaintiff cannot show

23   violation of a constitutional right).

24          On the single issue of epidural steroid injections, however, the Court has concluded that

25   Dr. Kuersten is not entitled to summary judgment on Mr. Doyle's Eighth Amendment claim.

26   Thus, the Court must determine if Dr. Kuersten is nevertheless entitled to qualified immunity.

27   Where, as here, a court denies summary judgment to a prison official on a claim of deliberate

28   indifference, the court may not end the qualified immunity analysis with the first prong.  *Estate of*

United States District Court
Northern District of California

1    *Ford v. Ramirez-Palmer*, 301 F.3d 1043, 1053 (9th Cir. 2002).  Instead, the Court must separately

2    undertake the second prong of the qualified immunity analysis.  *Id.*  Specifically, the inquiry

3    becomes whether it would have been clear to a reasonable officer, knowing what Dr. Kuersten

4    knew, that his failure to facilitate Mr. Doyle's appointment with Dr. Segal to receive the epidural

5    steroid injections posed such a substantial risk of serious harm that doing so would be

6    constitutionally impermissible.  *Id.*  The key question in this inquiry is whether the state of the law

7    provided "fair warning" that Dr. Kuersten's conduct was unconstitutional.  *Hope v. Pelzer*, 536

8    U.S. 730, 740 (2002).  The Court must take the facts in the light most favorable to Mr. Doyle, the

9    nonmoving party.  *Id.* at n. 1.

10          Dr. Kuersten summarily contends that it could not have been evident to a reasonable

11   official that his actions were deliberately indifferent to Mr. Doyle's medical needs, especially in

12   light of the treatment, medications, and referrals he provided to Mr. Doyle.  The record shows that

13   Dr. Kuersten was aware of the January 2011 Plan and that he took no subsequent steps to ensure

14   that Mr. Doyle was returned to Dr. Segal to receive the epidural steroid injections.  Dr. Kuersten,

15   in support of his motion, does not point to any evidence to support a finding that a reasonable

16   official would not have known that a decision to *ignore* – or at least to not address – Dr. Segal's

17   recommendation for epidural steroid injections could violate Mr. Doyle's constitutional rights.  On

18   this record, the Court finds that the facts, as interpreted in a light most favorable to Mr. Doyle,

19   indicate that Dr. Kuersten had fair warning that his decision not to at least address Dr. Segal's

20   recommendation could violate Mr. Doyle's constitutional rights.  *See Hope*, 536 U.S. at 740.

21   Moreover, as discussed in Section III(a)(1)(b), *supra*, a dispute remains as to whether Dr.

22   Kuersten denied, delayed, or intentionally interfered with medical treatment recommended by Dr.

23   Segal, constituting a violation of Mr. Doyle's Eighth Amendment rights.  Thus, Dr. Kuersten is

24   not entitled to judgment as a matter of law on qualified immunity grounds with respect to Mr.

25   Doyle's claims for deliberate indifference, negligence, or negligence per se based on the issue of

26   epidural steroid injections.

27

28

17

United States District Court
Northern District of California

1

**IV.     INJUNCTIVE RELIEF**

2      In its previous order on defendants' motion to dismiss, the Court noted its concern with

3   Mr. Doyle's requests for injunctive relief against the CDCR defendants, given that Mr. Doyle is

4   no longer housed at a CDCR facility.  (Dkt. No. 144 at 13:16-24.)  Nonetheless, the SAC seeks

5   injunctive relief against all defendants, and defendants did not move for summary judgment on the

6   injunctive relief separately.  The Court can discern no basis for this relief in light of the

7   circumstances.  Accordingly, Mr. Doyle is hereby **ORDERED TO SHOW CAUSE** why the Court

8   should not dismiss the requests for injunctive relief to properly narrow the issues for trial.  In

9   response to this order to show cause, no later than **Tuesday, October 6, 2015**, Mr. Doyle shall file

10  either: (a) a statement of up to **five pages** explaining whether a basis for injunctive relief exists; or

11  (b) a one-page statement setting forth his failure to comply.  Failure to file a response as required

12  will be construed as a concession that no basis for injunctive relief exists.  In the event Mr. Doyle

13  files a response, remaining defendant Dr. Kuersten may file a response up to **five pages** in

14  opposition to Mr. Doyle's response no later than **Tuesday, October 13, 2015**.

15

**V.     CONCLUSION**

16      For the reasons stated above, defendants' motion for summary judgment is **GRANTED** as to

17  defendants Dr. Sepulveda and administrators Ellis and Zamora, and **GRANTED IN PART** as to

18  defendant Dr. Kuersten.  The motion is **DENIED IN PART** as to defendant Dr. Kuersten to the

19  extent that plaintiff may be able to recover against defendant Dr. Kuersten for his failure to

20  facilitate plaintiff's epidural steroid injection treatment by Dr. Segal.

21      This Order terminates Dkt. No. 200.

22      **IT IS SO ORDERED.**

23  Dated: September 23, 2015

24      _____
        **YVONNE GONZALEZ ROGERS**
25      **UNITED STATES DISTRICT COURT JUDGE**

26

27

28